## UNITED STATES DISTRICT COURT
## <u>MIDDLE DISTRICT OF PENNSYLVANIA</u>

| | |
|---|---|
| BERNADETTE BEEKMAN, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE HERSHEY COMPANY, | |
| Defendant. | |

## <u>INTRODUCTION</u>

1.    Plaintiff Bernadette Beekman, individually and on behalf of all others similarly situated, brings this Class Action Complaint against The Hershey Company ("Defendant" or "Hershey") for its failure to disclose the use and presence of organic fluorine and/or per- and polyfluoroalkyl substances ("PFAS") in the packaging of several of its chocolate products (collectively, the "Products"). [1]

2.    PFAS compounds, colloquially known as "forever chemicals" for their inability to decompose over time, are known dangers to the human body and are known to cause serious health issues to those who inadvertently consume them.

---

[1] The affected Products include, but are not limited to, Hershey's Milk Chocolate Bar, Hershey's Cookies 'n' Crème Bar, Hershey's Kisses, Reese's Peanut Butter Cups, Reese's Pieces, Almond Joy, Mounds, and Kit Kat Bar. Plaintiff reserves the right to add additional products as appropriate.

Scientists have established that PFAS can migrate from food packaging through contact with the food itself.[2]

3.     Plaintiff would not have purchased or would not have paid premium prices for the Products if the truth  had been disclosed about potential PFAS contamination on the wrappers for and/or in the Products.

4.     Plaintiff seeks injunctive and monetary relief on behalf of a putative Nationwide Class and New York Subclass including, but not limited to, requiring Defendant to disclose PFAS on wrappers for and/or in the Products, and recompensing members of the proposed Classes. Plaintiff alleges the following based upon personal knowledge, investigation by her counsel, and upon information and belief.

## NATURE OF THE ACTION

5.     Defendant Hershey is a renowned American chocolate company that is considered one of the World's Most Trusted Companies, ranking third in the food and beverage industry,[3] and accordingly has built a strong reputation with consumers with the sale of its chocolate Products.

6.     Defendant represents to consumers its dedication to transparency and that it "support[s] consumers' right to know what is in their food"[4] and prominently displays that that it "hold[s] [itself] to the highest quality, safety, and sustainability

[2] *Per- and Polyfluoroalkyl Substances in Food Packaging: Migration, Toxicity, and Management Strategies*, National Library of Medicine: National Center for Biotechnology Information, https://pmc.ncbi.nlm.nih.gov/articles/PMC10993423 (last visited Dec. 19, 2024); J. Muncke, *et al., Impacts of food contact chemicals on human health: a consensus statement,* 19 Environmental Health 25 (2020).
[3] *World's Most Trustworthy Companies 2024,* Newsweek, https://www.newsweek.com/rankings/worlds-most-trustworthy-companies-2024 (last visited Dec. 19, 2024).
[4] *About our Ingredients*, Hershey, https://www.thehersheycompany.com/en_us/home/ingredients/about-our-ingredients.html (last visited Dec. 19, 2024).

standards."[5] Defendant reports that its "[c]ommitment to the highest food safety and quality standards is critical to ensuring our products create more goodness for consumers."[6]

7.      Defendant has direct control over the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of the Products throughout the United States, including in this District. It does not disclose anywhere on its packaging that the Products contain or have a material risk of containing PFAS and represents to consumers that "a key component of delivering safe, high-quality products to our consumers" is toxin and chemical free packaging.[7]

8.      Despite assurances of ingredient transparency and safety, the packaging of the Products has been shown to contain PFAS[8] and Defendant currently sells products using packaging containing PFAS to everyday consumers.[9]

9.      Defendant makes no statements to consumers that the Products contain or have a material risk of containing PFAS. There is no information on the Products' packaging disclosing the presence or risk of containing PFAS (Defendant's failure to disclose is hereinafter collectively referred to as "Omissions").

10.      Consumers generally lack the scientific knowledge necessary to determine whether or not their food, including Defendant's Products, contain PFAS,

[5] *Id.*
[6] *Hershey Goodness in Action, 2023 ESG Report*, Hershey, https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/pdf/hershey-2023-esg-report.pdf (last visited Dec. 19, 2024)
[7] *Sustainable Packaging,* Hershey, https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-areas/environment/packaging.html (last visited Dec. 19, 2024).
[8] *See High Levels of Banned PFAS Detected in Hershey's (NYSE: HSY) Packaging. Independent Tests Reveal Widespread Presence of Cancer-Linked "Forever Chemicals" in its Biggest Brands*, Grizzly Research, https://grizzlyreports.com/hsy/ (last visited Dec. 19, 2024) (hereinafter "Grizzly Report").
[9] *Id.*

or to deduce the health impact of the substances used to produce and package the Products.

11.     Reasonable consumers, like Plaintiff, do not expect that the Products will be contaminated, or have a material risk of being contaminated, by PFAS, and rely on statements from food producers, such as Defendant, to inform them of such potential contaminations. The presence of contaminants, such as PFAS, in food products or their packaging are material to a reasonable consumer's decision whether to purchase or consume those products or not.

12.     Further, several federal and state laws have banned PFAS in drinking water and, in some states, in food packaging specifically. Given these bans, reasonable consumers do not expect or suspect that everyday food products contain or have a risk of containing PFAS.

13.     As a result of the Omissions, reasonable consumers have no reason to believe that the packaging of the Products contains or have a risk of containing PFAS. Furthermore, the presence of contaminants, such as PFAS, in food products or their packaging are material to a reasonable consumer's decision whether or not to purchase or consume those products.

14.     As evidenced by its statements on transparency and safety, Defendant knows that its customers desire chocolate products that are safe for consumption, and that these customers will pay more for products they believe are sustainable and free of toxins. Defendant also knows that reasonable consumers would not knowingly consume, or feed to their families, products that contain or have a risk of containing PFAS.

15.     Defendant knows that consumers trust their statements, and that withholding the Omissions would materially affect the decision by consumers to purchase the Products.

16.     The Omissions are deceptive, misleading, unfair, and/or false because the Products contain or have a risk of containing undisclosed PFAS.

17.     The Omissions allowed Defendant to capitalize on and profit directly from reasonable consumers who paid a premium price for the Products. By omitting material information on the true quality and value of the Products, Defendant was able to reap increased profits from consumers purchasing the Products for more than they would have had Defendant disclosed the Omissions. Defendant continues to wrongfully induce consumers to purchase its Products at a price premium.

18.     Plaintiff brings this proposed consumer class action individually and on behalf of all other members of the Classes, who, during the relevant period, purchased for use, and not resale, any of Defendant's Products.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Classes, and some members of the proposed Classes are citizens of states different from Defendant.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is authorized to conduct business within this District, is headquartered in this District, has intentionally availed itself of the laws in this District, and conducts substantial business, including acts underlying the allegations of this Complaint, in this District.

## PARTIES

21.     Plaintiff Bernadette Beekman is, and at all times relevant hereto has been, a resident of New York County in the State of New York.

22.     Plaintiff has, during the relevant statutes of limitations, purchased Defendant's Products, including Hershey's Milk Chocolate Bars, Hershey's Kisses, Reese's Peanut Butter Cups, and Almond Joys. She has purchased these Products in New York at various retail stores, including the store in her apartment building, CVS, and Duane Reade.  Plaintiff believed she was purchasing quality Products that did not contain (or have a material risk of containing) PFAS. Plaintiff purchased the Products at retail prices offered in the stores.

23.     Prior to purchasing the Products, Plaintiff saw and relied upon the packaging of the Products. During the time Plaintiff purchased and consumed the Products and due to the Omissions by Defendant, she was unaware that the Products contained (or had a material risk of containing) PFAS and would not have purchased the Products if that information had been fully disclosed. Plaintiff would be willing to purchase the Products in the future if she could be certain that they do not contain (or have a material risk of containing) PFAS.

24.     Defendant Hershey is a Delaware corporation that has its principal place of business at 19 E. Chocolate Ave., Hershey, Pennsylvania 17033. Defendant operates and maintains its principal office and two manufacturing plants in Hershey, Pennsylvania and also operates and maintains additional manufacturing plants in Hazleton, Pennsylvania and Robinson, Illinois.

25.    Defendant manufactures Reese's Pieces, Reese's Peanut Butter Cups, Hershey's Milk Chocolate bars, Hershey's Kisses, and upon information and belief, Hershey's Cookies 'n' Cream bars in its Hershey, Pennsylvania manufacturing plants.[10] Defendant manufactures Kit Kat products at its Hazleton, Pennsylvania manufacturing plant.[11] Defendant manufactures Almond Joy and Mounds in its Robinson, Illinois manufacturing plant.[12]

26.    During the relevant time, Defendant controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Products throughout the United States, including, but not limited to, in Pennsylvania and New York. Defendant has done so continuously throughout the relevant period.

27.    Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Products that did not disclose the presence or risk of PFAS.

28.    Plaintiff relied upon the material Omissions missing from the Products' packaging which was prepared, reviewed, and/or approved by Defendant and its

---

[10] *Hershey Plant Locations,* Hershey, https://www.thehersheycompany.com/en_us/home/about-us/the-company/plant-locations.html (last visited Dec. 19, 2024).
[11] *Id.*
[12] *Almond Joy & Mounds,* Hershey, https://www.hersheyland.com/almond-joy-mounds (last visited Dec. 19, 2024).

agents and disseminated by Defendant and its agents through packaging that contained the Omissions. The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Products.

## FACTUAL ALLEGATIONS

I.    **Grizzly Research Reveals Widespread Presence of PFAS in Hershey's Packaging**

29.    On October 23, 2024, Grizzly Research published an investigatory report regarding the presence of PFAS in Hershey's Products. Grizzly Research tested the packaging of approximately 40 different food products for United States consumer retail, including Defendant's Products.  Grizzly Research "believe[s] Hershey's, Reese's, and other [Hershey] brands have severe PFAS contamination that the direct competition can avoid."[13] Grizzly Research further noted that "this [could] materially affect [Hershey's brands'] recognition and add material reputational and litigation risk to [Hershey]."[14]

**A. Testing Methods; Maximum Total Fluorine Testing and Direct PFAS Compounds Testing**

30.    Grizzly Research purchased samples from common United States retailers and sent samples of those same United States retail sales product to four anonymous laboratories for testing.

---

[13] *See* Grizzly Report.
[14] *Id*.

31.    The four laboratories: Lab 1_Ger, a startup based in the Germany; (2) Lab 2_Ger, an established lab based in Germany; (3) Lab 3_US, an established lab company based in the United States; and (4) Lab 4_Ch, an established lab based in China; were asked by Grizzly Research to test the purchased United States retail products for maximum detected fluorine contamination.[15]

32.    Each lab had a specific testing method: Lab 1_Ger's tested for fluorine indication by light reflection spectroscopy on flattened, non-mirroring foil (wrapper inside); Lab 2_Ger's tested for fluorine indication by ion selection electrode (DIN 13130-1) after Wickbold combustion (wrapper inside); Lab 3_US tested by counting the six most common PFAS, hexafluoropropylene oxide dimer acid ("HFPO-DA"), perfluorodecanoic acid ("PFDA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctane sulfonic acid ("PFOS"), using a slightly modified EPA method 537.1 on ethanol solution after foil contact (both sides of the wrapper); and Lab 4_Ch tested by combustion ion chromatography.[16] Each lab tested for the maximum detected fluorine amount, which is considered a reliable indicator of PFAS contamination.[17]

_____

[15] *Id.* The names of the labs commissioned by Grizzly Research remain anonymous and, for clarity, the stated shortcut lab names used by Grizzly Research in its report have been adopted herein.
[16] *Id.*
[17] *Id*.

33.    Lab 1_Ger, Lab 2_Ger, and Lab 4_Ch tested for maximum detected fluorine amounts whereas Lab 3_US's maximum detected fluorine amount consisted of the total levels of the six common PFAS it tested for.[18]

34.    Grizzly Research's testing results were the following for the Products' wrappers:[19]

| Maker | Product (U.S. Market) | maximum detected fluorine contamination | | | |
| --- | --- | --- | --- | --- | --- |
| | | Lab 1_Ger | Lab 2_Ger | Lab3_US* | Lab4_Ch |
| HSY | Reese's Peanut Butter Cup (foil) | high fluorine | | | |
| HSY | Reese's Peanut Butter Cup (cups) | NT | | 26.7 mg/kg | |
| HSY | Reese's Pieces | NT | 19.5 mg/kg | 22.9 mg/kg | 23.4 mg/kg |
| HSY | Reese's Pieces (E.U. market) | high fluorine | 81.5 mg/kg | NA | 71.9 mg/kg |
| HSY | Hershey's Kisses (foil or little white flag) | high fluorine | 15 mg/kg | 13.5 mg/kg | NT |
| HSY | Hershey's Milk Chocolate bar | indifferent | | 17.2 mg/kg | |
| HSY | Hershey's Cookies'n'Creme bar | NT | | 11.7 mg/kg | |
| HSY | KitKat bar | NT | 12 mg/kg | | |
| HSY | Almond Joy/Mounds bar** | indifferent | 14.5 mg/kg | 13.9 mg/kg | 33.2 mg/kg |
| HSY | Almond Joy/Mounds bar** (paper inlay) | NT | | | |
| Mars | Snickers bar | no fluorine | | | |
| Mars | Twix bar | NT | | | |
| Mars | Dove Dark Chocolate bar | no fluorine | | | |
| Nestlé | Nestlé Crunch bar | NT | | | |
| Ferrero | Butterfinger bar | NT | | 13.4 mg/kg | |

empty cell = not detected at 10 mg/kg detection limit
NT = not testable with method, NA = sample not available (issue with logistics/customs)
* totals of the six most common PFAS molecules tested
** Almond Joy and Mounds come in apparently identical packaging foil. For logistical reasons, Lab 2_Ger received Mounds samples, Lab 1_Ger, Lab3_US and Lab4_Ch received Almond Joy samples

35.    Test results from each of the Labs reveal the presence of PFAS in Defendant's Products, whereas comparisons to competitor chocolate products from Mars and Nestlé had no detectable level of PFAS across the board.[20]

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

36.    Lab 3_US's testing of Defendant's Products for HFPO-DA, PFDA, PFHxS, PFNA, PFOA, and PFOS also revealed the following:[21]

**Test of Packaging Foil with Direct Contact to Food by Lab3_US**

| Product | Company | HFPO-DA | PFDA | PFHxS | PFNA | PFOA | PFOS |
|---|---|---|---|---|---|---|---|
| Hershey's Milk Chocolate bar | HSY | | | | | | 17.2 mg/kg |
| Hershey's Cookies 'n' Creme bar | HSY | | | | | 11.7 mg/kg | |
| Reese's Pieces | HSY | 3.4 mg/kg | | 2.8 mg/kg | 1.2 mg/kg | 14.1 mg/kg | 1.4 mg/kg |
| Reese's Peanut Butter Cups | HSY | | | | | | |
| KitKat bar | HSY | | | | | | |
| Hershey's Kisses | HSY | | | | | | 13.5 mg/kg |
| Almond Joy | HSY | | | | | 3.1 mg/kg | 10.8 mg/kg |
| Snickers bar | Mars | | | | | | |
| Twix bar | Mars | | | | | | |
| Dove Dark Chocolate bar | Mars | | | | | | |
| Nestlé Crunch bar | Nestlé | | | | | 1.5 mg/kg | 3.1 mg/kg |
| Butterfinger bar | Ferrero | | | | | | 13.4 mg/kg |

Empty cell = not detected at 1.4 mg/kg detection limit

**Test of Other Packaging Components with Direct Contact to Food by Lab3_US**

| Product | Company | HFPO-DA | PFDA | PFHxS | PFNA | PFOA | PFOS |
|---|---|---|---|---|---|---|---|
| Reese's Peanut Butter Cups, paper cups | HSY | 6.9 mg/kg | 1.2 mg/kg | 2.5 mg/kg | 2.1 mg/kg | 14.0 mg/kg | |
| Almond Joy, paper inlay | HSY | | | | | | 2.9 mg/kg |

Empty cell = not detected at 1.0 mg/kg detection limit

37.    These results show the presence of at least one of the six common PFAS in almost all of the Products.

## II.    Defendant Omits Any Disclosure of PFAS on Its Packaging

38.    Defendant manufactures, designs, tests, packages, labels, markets, advertises, promotes, distributes, and sells its Products throughout the United States, including in Pennsylvania and New York.

39.    The Products are available at numerous retail and online outlets throughout the United States, including in Pennsylvania and New York.

---

[21] *Id.*

11

40.    Hershey consistently espouses that it "holds [itself] to the highest quality, safety, and sustainability standards, and states its commitment "to transparency and [that it] support[s] consumers' right to know what is in their food."[22]

41.    This is inconsistent, however, with reality as Defendant knows or should have known that the Products contain or have a material risk of containing PFAS yet failed to disclose this fact to consumers.

42.    Despite its dedication to "increased transparency through SmartLabel," an "industry-wide technology for U.S. Products" used for nutrition and ingredient disclosure, Defendants' packaging for its Products do not contain any reference to PFAS.[23]

43.    Defendant intentionally omitted the presence or material risk of PFAS in the packaging and/or the Products in order to induce and mislead reasonable consumers to purchase the Products and pay a price premium for them.

44.    As a result of the material Omissions, a reasonable consumer would not suspect the presence or material risk of PFAS in the Products without conducting their own time consuming and prohibitively expensive scientific tests.

---

[22] *See supra About our Ingredients*, Hershey, https://www.thehersheycompany.com/en_us/home/ingredients/about-our-ingredients.html (last visited Dec. 19, 2024).
[23]  *Id.*

12

45.    Information regarding the true nature and/or presence of PFAS in the Products was and is in the exclusive possession of Defendant and not available to consumers. Defendant chose to not disclose such information to consumers, and as a result concealed the presence and risk of PFAS in the Products from Plaintiff and Class members.

III.    **Due to the Presence and Material Risk of PFAS in the Products, the Omissions are Misleading**

A. **PFAS are Forever Chemicals**

46.    According to the EPA, "exposure to certain PFAS can cause:

   a.    Reproductive effects including decreased fertility or increased high blood pressure in pregnant women;

   b.    Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

   c.    Increased risk of some cancers, including prostate, kidney, and testicular cancers;

   d.    Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

   e.    Interference with the body's natural hormones; and

f.  Increased cholesterol levels and/or risk of obesity."[24]

47.    The EPA "now considers there is no safe level of PFOA or PFOS exposure."[25]

48.    PFAS were widely used in food packaging products due to their water and grease resistant properties.[26]

49.    Research conducted by the Harvard T.H. Chan School of Public Health in 2012  establishes that children with higher PFAS exposure had worse responses to standard childhood vaccines and that "when PFA exposure was double, children would lose 50% of the antibodies they should have had from their vaccinations."[27] This research also established that "children with higher levels of PFAS when they were born… had lower antibody levels in response to later vaccinations."[28]

---

[24] *Our Current Understanding of the Human Health and Environmental Risks of PFAS,* United States Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited Dec. 19, 2024).

[25] EPA Restricts Toxic PFAS "Forever Chemicals" Found in Drinking Water, National Resources Defense Council, https://www.nrdc.org/press-releases/epa-restricts-toxic-pfas-forever-chemicals-found-drinking-water-0#:~:text=PFOA%20and%20PFOS:%20As%20EPA,standards%20for%20the%20six%20PFAS (last visited Dec. 19, 2024).

[26] *Stricter Guidelines on "forever chemicals" in drinking water pose challenges,* Harvard T.H. Chan School of Public Health, https://www.hsph.harvard.edu/news/features/stricter-federal-guidelines-on-forever-chemicals-in-drinking-water-pose-challenges/ (last visited Dec. 19, 2024).

[27] *See id.*

[28] *Id.*

50.    Research conducted by the National Cancer Institute's Division of Cancer Epidemiology & Genetics has also shown that PFAS "measured in women during pregnancy were associated with risk of childhood acute lymphoblastic leukemia (ALL) in their offspring."[29] The research found that "[b]ecause PFOS and PFOA can suppress antibody responses, it is plausible for some PFAS to be risk factors for childhood leukemia."[30]

### B. PFAS Used in Food Wrappers Migrate Into The Food Itself

51.    Scientific research studies over several years establish that PFAS used in food packaging can migrate into foods:

    a.    A study by Arabela Ramirez Carnero, *et al.* published in the Multidiscipline Digital Publishing Institute in June 2021, *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFS) in Food Contact Materials (FCM) and its Migration to Food*.[31]

    b.    A published study in March 2023, *Directly Fluorinated Containers as a Source of Perfluoroalkyl Carboxylic Acids*, showed that PFAS migrate from the fluorinated containers into food.[32]

---

[29] J. K. Loukissas, M.P.P., *Childhood Leukemia Linked to PFAS Levels Measured in Mother's First Trimester,* National Cancer Institute: Division of Cancer Epidemiology & Genetics, https://dceg.cancer.gov/news-events/news/2023/pfas-childhood-leukemia (last visited Dec. 19, 2024).

[30] *Id.*

[31] Arabela Ramirez Carnero, Anitia Lestido-Cardama, Patricia Vazquez Loureiro, Letricia Barbosa-Pereira, Ana Rodriguez Bernaldo de Quiros, Raquel Sendon, *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, Foods 2021, 10(7):1443. DOI: 10.3390/foods10071443.

[32] Heather D. Whitehead and Graham F. Peaslee, *Environmental Science & Technology Letters,* 2023 10(4), 350-355. DOI: 10.1021/acs.estlett.3c00083.

c.  Another published study in March 2023, *Per- and Polyfluoroalkyl Substances in Canadian Fast Food Packaging*, stored eight PFAS-contaminated food product wrappers from fast food restaurants in a dark, enclosed area for two years. Testing for the wrappers before and after the two-year stretch reveal as much as an 85% drop in PFAS levels in the wrappers, which the researchers used to conclude that over time PFAS break off from packaging and can contaminate the food it contacts.[33]

d.  A study published in March 2020, *Impacts of food contact chemicals on human health: a consensus statement*, concluded that it is an "area of certainty" that chemicals migrate from food contact into food, and found "evidence for [PFAS] migration from food contact articles."[34]

e.  A study published in March 2008 studied the amount of migration that occurs into food-simulating liquids and the characteristics of the migration of PFAS. Migration characteristics were examined in different foods and the results indicated that PFAS can migrate from the food packaging into the food itself.[35]

---

[33] H. Schwartz-Narbonne, C. Xia, A. Shalin, H. D. Whitehead, D. Yang, G. F. Peaslee, Z. Wang, Y. Wu, H. Peng, A. Blum, M. Venier, M. L. Diamond, *Per- and Polyfluoroalkyl Substances in Canadian Fast Food Packaging*, Environmental Science & Technology Letters 2023 10(4), 343-349. DOI: 10.1021/acs.estlett.2c00926.

[34] J. Muncke, et al*., Impacts of food contact chemicals on human health: a consensus statement,* 19 Environmental Health 25 (2020).

[35] TH Begley, W. Hsu, G. Noonan, G. Diachenko, *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*. Food Addit Contam Part A Chem Anal Control Expo Risk Assess. 2008 25(3), 384-90. DOI: 10.080/02652030701513784.

52.    The United States Food and Drug Administration ("FDA") has also stated that PFAS can "enter foods through food packaging, processing, and cookware."[36]

## IV.    Certain Federal and State Laws Have Banned PFAS

53.    No reasonable consumer expects, suspects, or understands that the Products contain or have a material risk of containing PFAS particularly given the current Federal and state laws concerning PFAS.

54.    In April 2024, the EPA released its Final PFAS National Primary Drinking Water Regulation, through which it established its Maximum Contaminant Level Goal ("MCLG"), a non-enforceable health-based goal of zero ppt, and a Maximum Contamination Level ("MCL"), an enforceable level set to 4.0 ppt for PFOA and PFOS, individually. 40 C.F.R. §§ 141.00, *et seq.*

55.    Some states have also individually implemented policies to address and reduce PFAS contamination. According to Safer States, a national alliance of environmental health organizations and coalitions working to safeguard people and the planet from toxic chemicals, 30 states have already adopted 155 policies pertaining to PFAS, while 34 states have introduced 292 policies.[37]

---

[36] *Per- and Polyfluoroalkyl Substances (PFAS)*, United States Food & Drug Administration, https://www.fda.gov/food/environmental-contaminants-food/and-polyfluoroalkyl-substances-pfas (last visited Dec. 19, 2024).

[37] *Safer States: Bill Tracker*, Safer States, https://www.saferstates.org/bill-tracker/?toxic_chemicals=PFAS (last visited Dec. 19, 2024).

56.    Thirteen of those states (California, Colorado, Connecticut, Hawaii, Maine, Maryland, Minnesota, New Hampshire, New York, Oregon, Rhode Island, Vermont, and Washington) have already outlawed the use of PFAS in food packaging specifically.[38]

## V.    Defendant's Products' Packaging Can Be Manufactured Without PFAS

57.    Defendant could have manufactured the packaging for its Products to be free of PFAS. As revealed through Grizzly Research's testing, Defendant's direct competitors, such as Mars, can and do manufacture packaging with no detectable level of PFAS.[39]

58.    Experts that Grizzly Research spoke to for its investigation were surprised by the high levels of PFAS found in the wrappers of Defendant's Products as it is unnecessary for plastic wrappers to be anti-stick or anti-grease.[40] There is no cognizable need for Defendant to package its Products in PFAS-contaminated wrappers.

---

[38] *Our Priorities: PFAS "Forever Chemicals,"* Safer States, https://www.saferstates.org/priorities/pfas/ (last visited Dec. 19, 2024).
[39] *See* Grizzly Report.
[40] *Id.*

59.    While the FDA authorizes the use of specific types of substances that contain PFAS for use in food contact applications, food packaging is not an authorized use.[41]

60.    Defendant, just like thousands of other food manufacturers in the United States, including its competitors, can and should be manufacturing its product packaging without PFAS.[42]

## VI.    The Material Omissions Misled and Deceived Reasonable Consumers

61.    The popularity of Defendant's Products is directly tied to consumers' trust that Hershey's chocolates are not contaminated with toxins or chemicals.

62.    Defendant's Omissions wrongfully convey to consumers that the Products are of a high quality, safe for consumption, and have certain characteristics that they do not actually possess.

63.    Defendant misleadingly causes consumers to believe its Products do not contain PFAS, when in fact the Products contain or have a material risk of containing dangerous, undisclosed levels of PFAS, which is material information to reasonable consumers and Plaintiff.

---

[41] *Authorized Uses of PFAS in Food Contact Applications*, United States Food & Drug Administration, https://www.fda.gov/food/process-contaminants-food/authorized-uses-pfas-food-contact-applications (last visited Dec. 19, 2024).
[42] *FDA, Industry Actions End Sales of PFAS Used in Food Packaging,* United States Food & Drug Administration, https://www.fda.gov/news-events/press-announcements/fda-industry-actions-end-sales-pfas-used-us-food-packaging (last visited Dec. 19, 2024).

64.    However, as shown above, testing conducted by Grizzly Research of Defendant's Products established that they contain PFAS. [43]

65.    Defendant wrongfully failed to disclose to reasonable consumers material information regarding the presence (or material risk) of PFAS in the Products.

66.    Due to the Omissions, reasonable consumers, like Plaintiff, have no reason to suspect PFAS contamination in the Products. Unlike Defendant, reasonable consumers are not able to independently detect the presence of PFAS in the Products and cannot feasibly conduct scientific tests on the Products. Further, any information regarding the presence of PFAS in the Products is in the exclusive possession of Defendant and not available to consumers. Defendant chose to not disclose such information to consumers and thus actively concealed the presence and risk of PFAS in the Products.

67.    The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiff, in their purchasing decisions. This is especially true considering Defendant's efforts to market itself as a "values-driven" company committed to "being transparent about the ingredients inside" Hershey products.[44]

---

[43] *See* Grizzly Report.
[44] *World's Most Trustworthy Companies 2024,* Newsweek, https://www.newsweek.com/rankings/worlds-most-trustworthy-companies-2024 (last visited Dec. 19, 2024).

68.    Reasonable consumers must and do rely on Defendant to honestly report what its Products contain.

69.    Based on the failure to disclose the presence of PFAS in the Products' packaging, reasonable consumers have no reason to expect, suspect, or understand that the Products contained or had a material risk of containing PFAS.

70.    In light of Defendant's statements regarding the quality of the Products, Defendant knew or should have known the Products contained or had a material risk of containing PFAS.

71.    Defendant had a duty to ensure the Products were not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

72.    Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive packaging based on the material Omissions.

73.    Defendant knew that properly and sufficiently monitoring the Products for PFAS was not only important, but critical.

74.    Defendant knew or should have known it could control the levels of PFAS in the Products by requiring proper monitoring and testing for PFAS at manufacturing and packaging stages, and making changes when needed to ensure the safety of the Products.

75.     The Omissions make the Products' packaging deceptive based on the presence or risk of PFAS in the Products. Reasonable consumers, like Plaintiff, would consider the presence or risk of PFAS in the Products a material fact when considering which Products to purchase.

76.     Defendant knew, yet failed to disclose, that it was not sufficiently or adequately monitoring or testing the Products or their packaging for PFAS.

77.     The Omissions were misleading due to Defendant's failure to sufficiently or adequately monitor or test for and disclose the presence (or material risk) of PFAS in the Products.

78.     Defendant knew or should have known that the Products contained or may contain undisclosed levels of PFAS that were not disclosed on the packaging.

79.     Defendant knew or should have known that reasonable consumers expected Defendant to sufficiently monitor and test the Products and their packaging for PFAS to ensure the quality of the Products.

80.     Defendant knew or should have known that reasonable consumers paid higher prices for the Products and expected Defendant to sufficiently test and monitor the Products and their packaging for the presence of PFAS.

81.     The Omissions are material and render the Products' packaging deceptive because without full disclosure, reasonable consumers believe the Products do not contain or have a material risk of containing PFAS.

82.     The Omissions were intended to and did, in fact, cause consumers like Plaintiff and the members of the Classes to purchase products they would not have if the true quality and characteristics were disclosed or for which they would not have paid a premium price.

83.     As a result of Defendant's Omissions, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, Plaintiff and similarly situated consumers who paid the purchase price or premium for the Products.

84.     Plaintiff and other reasonable consumers would not have purchased the Products or would have paid less for them but for Defendant's Omissions concerning the presence (or material risk of the presence) of PFAS in the Products.

## CLASS ALLEGATIONS

85.     Plaintiff brings this action individually and on behalf of the following Classes pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (3), and (c)(4):

**Nationwide Class**: All persons who, during the applicable statute of limitations to the present, purchased the Products in the United States for household use, and not for resale (the "Nationwide Class").

**New York Subclass**: All persons who, during the applicable statute of limitations to the present, purchased the Products in New York for household use, and not for resale (the "New York Subclass").

86.     Members of the Nationwide Class and the New York Subclass are sometimes, where appropriate, referred to herein collectively as "Class Members" or the "Classes."

87.     Excluded from the Classes are Defendant, any of Defendant's parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, or co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

88.     This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

89.     **Numerosity**: The members of the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

90.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Questions of law and fact common to Plaintiff and the Classes include, but are not limited to, the following:

a.  Whether Defendant owed a duty of care;

b.  Whether Defendant owed a duty to disclose;

c.  Whether Defendant knew or should have known that the Products contained or had a risk of containing PFAS;

d.  Whether Defendant failed to disclose that the Products contained or had a risk of containing PFAS;

e.  Whether the claims of Plaintiff and the Classes serve a public benefit;

f.  Whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

g.  Whether the Omissions are material to a reasonable consumer;

h.  Whether the inclusion of PFAS in the wrapper of the Products is material to a reasonable consumer;

i.  Whether the Omissions are likely to deceive a reasonable consumer;

j.  Whether Defendant had knowledge that the Omissions were material and false, deceptive, and misleading;

k.  Whether Defendant breached its duty of care;

l.  Whether Defendant breached its duty to disclose;

m. Whether Defendant violated the laws of the State of New York;

n.  Whether Defendant engaged in unfair trade practices;

o.  Whether Defendant engaged in false advertising;

p.  Whether Plaintiff and members of the Classes are entitled to actual, statutory, treble, and punitive damages; and

q.  Whether Plaintiff and members of the Classes are entitled to declaratory and injunctive relief.

91.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

92.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and the Class Members sustained damages as a result of Defendant's uniform wrongful conduct during transactions with them.

93.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and there are no defenses unique to Plaintiff. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Classes and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Classes.

94. **Risks of Prosecuting Separate Actions**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the proposed Classes.

95. **Policies Generally Applicable to the Class**: This case is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the proposed Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Classes and making final injunctive relief appropriate with respect to the proposed Classes as a whole. Defendant's practices challenged herein apply to and affect the members of the Classes uniformly, and Plaintiff's challenge to those practices hinges on Defendant's conduct with respect to the proposed Classes as a whole, not on individual facts or law applicable only to Plaintiff.

96. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the members of the Classes. The injuries suffered by each individual member of the Classes are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for

individual members of the Classes to obtain effective relief from Defendant. Even if Class Members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

## COUNT ONE
### Violation of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the New York Subclass)

97.    Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1–96, as though fully set forth herein.

98.    Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

99.    New York General Business Law ("GBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

100.   In its advertising and sale of the Products throughout New York, Defendant conducts business and trade within the meaning of GBL § 349.

101.   Defendant violated GBL § 349 by knowingly, deceptively and misleadingly omitting that the Products contained (or had a material risk of containing) PFAS.

102.   Defendant knew or should have known the Products did not have the quality or standards as described above because they contained (or had a material risk of containing) undisclosed levels of PFAS.

103.   Defendant intended that Plaintiff and the New York Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Products' quality and standards when deciding to purchase the Products, unaware of the undisclosed material facts.

104.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiff, the New York Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Products. Had Plaintiff and members of the New York Subclass known the Products did not have the quality and standards as advertised by Defendant and instead contained (or had a material risk of containing) PFAS, they would not have purchased the Products or paid the premium price.

105.   Defendant's Omissions, concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's trade or commerce and were capable of deceiving a substantial portion of the consuming public.

106.   Defendant's Omissions and other deceptive acts or practices caused Plaintiff and the New York Subclass to suffer injury in the form of actual damages when they purchased the Products that were worth less than the price they paid and

that they would not have purchased had they known the Products contained (or had a material risk of containing) PFAS.

107.   As a direct and proximate result of Defendant's deceptive, misleading, unfair, and unconscionable practices as set forth above, Plaintiff and the New York Subclass have been harmed, and that harm will continue unless Defendant is enjoined from further omitting the true quality of the Products.

108.   Pursuant to GBL § 349(h), Plaintiff and the New York Subclass seek injunctive relief, declaratory relief, full refund, compensatory and punitive damages, actual damages or $50 (whichever is greater), statutory damages of three times the actual damages (up to $1000), and reasonable attorneys' fees.  Plaintiff and the New York Subclass also seek an award of costs to the extent permitted by law.

## COUNT TWO
### Violation of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 350
### (On Behalf of Plaintiff and the New York Subclass)

109.   Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1–96, as though fully set forth herein.

110.   Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

111.   New York GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

112.   Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect … [considering] representations made by statement, word [or] design [and] the extent to which the advertising fails to reveal facts material in light of such representations."

113.   Defendant violated GBL § 350 by knowingly, deceptively and misleadingly omitting from its advertising on its packaging that the Products contained (or had a material risk of containing) PFAS.

114.   Defendant knew or should have known the Products did not have the quality or standards as described above because they contained (or had a material risk of containing) undisclosed levels of PFAS.

115.   Defendant intended that Plaintiff and the New York Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Products' quality and standards when deciding to purchase the Products, unaware of the undisclosed material facts.

116.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiff, the New York Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Products. Had Plaintiff and members of the New York Subclass known the Products did not have the quality and standards as advertised by Defendant and instead contained (or had a material risk

of containing) PFAS, they would not have purchased the Products or paid the premium price.

117.   Defendant's Omissions, concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's trade or commerce and were capable of deceiving a substantial portion of the consuming public.

118.   Defendant's Omissions and other deceptive acts or practices caused Plaintiff and the New York Subclass to suffer injury in the form of actual damages when they purchased the Products that were worth less than the price they paid and that they would not have purchased had they known the Products contained (or had a material risk of containing) PFAS.

119.   As a direct and proximate result of Defendant's violation of GBL § 350 as set forth above, Plaintiff and the New York Subclass have been harmed, and that harm will continue unless Defendant is enjoined from further omitting the true quality of the Products.

120.   Pursuant to GBL § 350-E, Plaintiff and the New York Subclass seek injunctive relief, declaratory relief, full refund, compensatory and punitive damages, actual damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and reasonable attorneys' fees. Plaintiff and the New York Subclass also seek an award of costs to the extent permitted by law.

**COUNT THREE**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class,**
**Or, Alternatively, the New York Subclass)**

121.   Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1–96, as though fully set forth herein.

122.   Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant or, alternatively, individually and on behalf of the New York Subclass.

123.   Substantial benefits have been conferred on Defendant by Plaintiff and the members of the Classes through the purchase of the Products. Defendant knowingly and willingly accepted and enjoyed these benefits.

124.   Defendant either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Products would not contain PFAS. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

125.   Defendant was obligated to disclose the presence of PFAS in the Products because:

    a.   Defendant had exclusive knowledge of the presence of PFAS in the Products that were not known or reasonably accessible to Plaintiff and the members of the Classes; and

b.  Defendant actively concealed the presence of PFAS from Plaintiff and the members of the Classes.

126.   Defendant's acceptance and retention of the benefits of the payments from Plaintiff and the members of the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and the members of the Classes.

127.   Plaintiff and the members of the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

128.   Plaintiff and the members of the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, pray for judgment against Defendant as to each and every count, including:

(a)  An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

(b)   An order enjoining Defendant from selling the Products until the PFAS are removed or full disclosure of the presence of same appears on all packaging;

(c)   An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

(d)   An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

(e)   An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

(f)   An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

(g)   An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein, in an amount to be determined by this Court, but at least $5,000,000;

(h)   An order requiring Defendant to pay punitive damages on any count so allowable;

(i)   An order awarding attorneys' fees and costs to Plaintiff and the Classes; and

(j)   An order providing for all other such equitable relief as may be just and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims so triable.

Dated: December 24, 2024

Respectfully submitted,

By: *s/Patrick Howard*
Patrick Howard
**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3986
phoward@smbb.com

Catherine K. Smith (*pro hac vice forthcoming*)
Shashi K. Gowda (*pro hac vice forthcoming*)

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
csmith@gustafsongluek.com
sgowda@gustafsongluek.com

**GEORGE FELDMAN MCDONALD, PLLC**
Janine L. Pollack*
745 5th Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
jpollack@4-justice.com
eservice@4-justice.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman*
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
lfeldman@4-justice.com
eservice@4-justice.com

**GEORGE FELDMAN MCDONALD, PLLC**
Rebecca A. Peterson*
1650 W. 82nd St., Suite 880
Bloomington,  MN  55431
Telephone: (612) 778-9595
rpeterson@4-justice.com
eservice@4-justice.com

37

**GEORGE FELDMAN MCDONALD, PLLC**
David J. George*
Brittany L. Sackrin*
9897 Lake Worth Road, Suite #302
Lake Worth Corridor, FL
Telephone: (561) 232-6002
dgeorge@4-justice.com
bsackrin@4-justice.com
eservice@4-justice.com

**FARUQI & FARUQI, LLP**
Timothy J. Peter*
1617 JFK Boulevard, Suite 1550
Philadelphia, PA 19103
Telephone: (212) 277-5770
tpeter@faruqilaw.com

* *Pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Putative Class*